## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GST AUTOLEATHER, INC., *et al.*,[1] | ) Case No. 17-12100 (LSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF

GST AutoLeather, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] respectfully submit this motion for the relief set forth herein. In support of this motion, the Debtors respectfully proffer the *Declaration of Jason A. Cohen in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: GST AutoLeather, Inc. (5289); GST AutoLeather Cayman I Ltd. (n/a); GST AutoLeather Cayman II Ltd. (n/a); GST AutoLeather HoldCo Corp. (4266); GST Innovations, LLC (5563); and Strategic Financial LLC (n/a). The location of the Debtors' service address is: 20 Oak Hollow Drive, Suite 300, Southfield, Michigan 48033.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jonathan Hickman, Chief Restructuring Officer of GST AutoLeather, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on October 3, 2017 (the "Petition Date").

(the "Cohen Declaration"), attached hereto as **Exhibit B**, and the First Day Declaration.  In further support of this motion, the Debtors respectfully state the following:

**Preliminary Statement**[3]

1.      This motion requests that the Court approve a senior secured superpriority priming debtor in possession credit facility in the amount of $25 million on an interim basis and $40 million in the aggregate on a final basis (collectively, the "DIP Facility") provided by Royal Bank of Canada, as administrative agent and collateral agent (in such capacity, the "DIP Agent"), and the lenders thereunder (collectively, the "DIP Lenders").  The DIP Facility will provide the Debtors with sufficient liquidity to stabilize and fund the Debtors' general and corporate operations during these chapter 11 cases.

2.      Additionally, the Debtors and Prepetition Lenders are negotiating the terms of an acquisition of the Company by the Prepetition Lenders. This would serve as a backstop in the 363 sale and will pave the path for the Debtors to exit chapter 11 and maintain the business as a going concern.  The Debtors will file a motion for approval of bidding procedures and stalking horse protections in the near term.

3.      Absent entry into the DIP Facility, the Debtors will have no alternative but to immediately cease operating and convert these cases to cases under chapter 7 of the Bankruptcy Code.  The liquidity provided by the DIP Facility will ensure the Debtors can continue to operate uninterrupted in the ordinary course of business and will provide the Debtors with sufficient time to bridge to a sale of substantially all the Debtors' assets.

---

[3]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms further below in this motion, the DIP Agreement, or in the Interim DIP Order, as applicable.

4.      The DIP Facility was the product of an extensive, arm's-length negotiation with the DIP Lenders.  As discussed herein and in the Cohen Declaration, the DIP Facility was preceded by a competitive marketing process designed to secure postpetition financing on the best available terms.  As part of this process, Lazard, the Debtors' proposed investment banker, solicited proposals for debtor in possession financing from six parties in addition to the Prepetition Lenders, the Mezzanine Lenders, and the Debtors' sponsor.  With regard to the six alternative lenders contacted, the lenders expressed concern with providing the DIP financing because, among other things, the Debtors' recent financial performance was negative, the Prepetition Lenders had a lien on substantially all of the Debtors' collateral, the amount of the DIP financing needed, and the fact that much of the Company's collateral was located outside of the U.S.  Additionally, these potential lenders were not willing to engage in a priming fight with the Prepetition Lenders.  Further, the Prepetition Lenders were unwilling to provide unsecured administrative credit, credit secured only by junior liens, or credit secured by foreign unencumbered assets.  They were, however, willing to provide debtor in possession financing on a senior-secured basis.

5.      Following receipt of the Prepetition Lenders' proposal for a DIP Facility, the Debtors and the Prepetition Lenders entered into extensive, arm's-length negotiations regarding the terms and the amount of the proposed DIP facility.  Following these negotiations, the Debtors and certain of the Prepetition Lenders reached an agreement on the terms of a $40 million priming DIP Facility that will provide the Debtors with sufficient capital to administer these chapter 11 cases.  The proposed DIP Facility includes a budget (the "Budget") along with certain milestones and operational covenants, including delivery of schedules, assignments, financial statements, and weekly reports of receipts and budgeted cash usage.

3

6.      Notably, holders of substantially all of the loans under the Prepetition Credit Agreement (as defined below) have consented to the incurrence of the DIP Facility, including the granting of priming liens and a superpriority administrative claim to the DIP Agent, on behalf of itself and the DIP Lenders, which far exceeds the consent threshold of over 50 percent of such debt required under the Prepetition Credit Agreement.

7.      By this motion, the Debtors also seek authorization to use Cash Collateral in the ordinary course of business to, among other things, provide working capital and for other general corporate purposes, with the objective of providing the Debtors with the funding necessary to continue their operations until the consummation of the sale.

8.      For the reasons set forth below, in the Cohen Declaration, and the First Day Declaration, the Debtors firmly believe that the DIP Facility will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2**

9.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order,"[4] and together with the Interim DIP Order, the "DIP Orders"):  (a) authorizing the Debtors to obtain the DIP Facility as set forth in that certain loan agreement, annexed as **Exhibit 1** to **Exhibit A** attached hereto (the "DIP Agreement" and, together with all agreements, documents, and instruments executed and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with the DIP Orders, the "DIP Documents") among GST

---

[4]     The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

AutoLeather Cayman I Ltd. ("Holdings"), GST AutoLeather Cayman II Ltd. ("Parent"), GST AutoLeather, Inc. ("Borrower"), any Intermediate Holding Company and each domestic restricted subsidiary of Parent (other than any excluded subsidiary) listed on Schedule 1.01B to the DIP Agreement (the "Guarantors"), the DIP Agent, and the DIP Lenders; (b) granting liens and providing superpriority claims with respect to such postpetition financing; (c) authorizing the Debtors to use Cash Collateral; (d) approving the form of adequate protection to be provided to certain prepetition lenders; (e) modifying the automatic stay on a limited basis as set forth herein; (f) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (g) granting related relief.

10.     The provisions of the DIP Agreement and the Interim DIP Order were extensively negotiated and are the most favorable terms that the Debtors were able to obtain.  Moreover, the Debtors have an urgent need for the DIP Facility.  Approval of the DIP Facility will ensure the Debtors are able to maintain their operations, pursue these chapter 11 cases, and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors request that the Court enter the Interim DIP Order and Final DIP Order approving the DIP Facility.

11.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[5]

| Bankruptcy Code/Local Rule | Summary of Material Terms |
| --- | --- |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | GST AutoLeather, Inc., a Delaware corporation.<br>*See* DIP Agreement Preamble; Interim DIP Order Preamble. |

---

[5]     The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | GST AutoLeather Cayman II Ltd. ("<u>Parent</u>") Parent (in the absence of any Intermediate Holding Company), any Intermediate Holding Company and each domestic Restricted Subsidiary of Parent (other than any Excluded Subsidiary) including as of the Closing Date those that are listed on Schedule 1.01B hereto (each, a "<u>Guarantor</u>").<br><br>*See* DIP Agreement Preamble, § 1.01; Interim DIP Order Preamble. |
| **DIP Facility Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Royal Bank of Canada, in its separate capacities as Administrative Agent and Collateral Agent, and each lender from time to time party hereto.<br><br>*See* DIP Agreement Preamble; Interim DIP Order Preamble. |
| **Term**<br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B)<br>Local 4001-2(a)(ii) | "<u>Maturity Date</u>" means six months after the Closing Date; provided that if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.<br><br>*See* DIP Agreement § 1.01.<br><br><u>Optional</u>. Borrower may, upon written notice to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class; *provided* that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof. Notwithstanding the foregoing, Borrower may rescind or postpone any notice of termination of the Commitments if such termination would have resulted from a refinancing of all of the Facility, which refinancing shall not be consummated or otherwise shall be delayed.<br><br><u>Mandatory</u>. The Delayed Draw Term Commitment of each Delayed Draw Term Lender shall be automatically and permanently reduced to $0 upon the making of such Delayed Draw Term Lender's Delayed Draw Term Loans pursuant to Section 2.01(b) of the DIP Agreement. The Roll-Up Term Commitment of each Lender shall be automatically and permanently reduced to $0 upon the deemed making of such Lender's Roll-Up Term Loans pursuant to Section 2.01(a) of the DIP Agreement.<br><br>*See* DIP Agreement § 2.06. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The total DIP Facility shall include loans to be advanced and made available to the Borrower in the aggregate maximum principal amount of $40 million in delayed draw term loan commitments, pursuant to which for each $1 of DIP Delayed Draw Commitments provided by a Prepetition Lender, $1 of the Prepetition Credit Agreement Indebtedness owed to such Prepetition Lender under the Prepetition Credit Agreement shall roll up into the DIP Facility.<br><br>*See* DIP Agreement § 2.01; Interim DIP Order Preamble. |

| | |
|---|---|
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | <u>Conditions of Initial Credit Extension</u>.  The obligation of each Lender to make its initial Credit Extension under the DIP Agreement is subject to satisfaction of the following conditions precedent except as otherwise agreed between Borrower and the Administrative Agent: (a) The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each in form and substance satisfactory to the Administrative Agent and its legal counsel: (i) executed counterparts of the DIP Agreement and the Guaranty; (ii) a Note executed by Borrower in favor of each Lender that has requested a Note at least five (5) Business Days in advance of the Closing Date; (iii) each Collateral Document set forth on Schedule 1.01A to the DIP Agreement required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with (except as provided in such Collateral Documents); (A) certificates, if any, representing the pledged, mortgaged and/or charged equity referred to therein accompanied by undated stock powers or share transfers executed in blank and (if applicable) instruments evidencing the pledged debt referred to therein endorsed in blank; and (B) evidence that all other actions, recordings and filings that the Administrative Agent or Collateral Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent and Collateral Agent; (iv) such certificates (including a certificate substantially in the form of Exhibit J to the DIP Agreement) of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the DIP Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date; (v) an opinion from Kirkland & Ellis LLP, New York counsel to the Loan Parties; (vi) a certificate of a Responsible Officer of Borrower attesting as to the matters set forth in Section 4.02 of the DIP Agreement; (vii) evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect and that the Administrative Agent and Collateral Agent has been named as loss payee and additional insured under each insurance policy with respect to such insurance as to which the Administrative Agent shall have requested to be so named; (viii) a Committed Loan Notice relating to the initial Credit Extension; (ix) if available in the relevant jurisdiction, copies of a recent Lien, bankruptcy, insolvency, judgment, copyright, patent and trademark search in each jurisdiction reasonably requested by the Collateral Agent with respect to the Loan Parties; and (x) the Budget; (b) All fees and expenses required to be paid hereunder or pursuant to the Fee Letter and the Agent Fee Letter, in the case of expenses, to the extent invoiced at least three (3) Business Days prior to the Closing Date, shall have been paid in full in cash or will be paid on the Closing Date out of the initial Credit Extension; (c) The Petition Date shall have occurred; (d) The Interim Order Date shall have occurred not later than three (3) Business days after the Petition Date.  The Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders; provided that if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance of any Loan Party of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal; (e) The Administrative Agent and the Initial Lenders shall have received at least three business days prior to the Closing Date all documentation and other information about Borrower and the Guarantors as has been reasonably requested in writing at least five Business Days prior to the Closing Date by the Administrative Agent and the Initial Lenders that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; (f) No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | the Bankruptcy Code shall have been appointed in any of the Cases; (g) Except for the Cases, no event of the type described in Section 8.01 (f) or (g) of the DIP Agreement shall have occurred with respect to any Restricted Subsidiary or any Affiliate thereof; (h) The First Day Orders entered by the Bankruptcy Court or any other court, to the extent affecting the rights or obligations of the Administrate Agent, the Lenders, or the agent or the lenders under any Prepetition Credit Agreement, or which may give rise to a postpetition claim, administrative in nature or otherwise, shall be in form and substance acceptable to the Administrative Agent and the Required Lenders in their sole and absolute discretion. Such First Day Orders shall have been entered on or prior to the Closing Date; (i) Arrangements in respect of letters of credit issued pursuant to the Prepetition Credit Agreement in form and substance satisfactory to the Administrative Agent, the Required Lenders, and the applicable issuing banks. <br><br> *See* DIP Agreement § 4.01. <br><br> <u>Conditions to All Credit Extensions</u>. The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Eurocurrency Rate Loans) is subject to the following conditions precedent: (a) The representations and warranties of Borrower and each other Loan Party contained in this Agreement or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates. (b) No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom. (c) The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof. (d) No motion, order or injunction challenging the Delayed Draw Term Loans or transactions contemplated thereby shall exist. (e) Other than with respect to the initial Delayed Draw Term Borrowing (to which Section 4.01(d) applies), the Final Order shall have been entered within 45 days of the Petition Date and be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders; *provided* that if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance of any Loan Party of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal. (f) Borrower shall have paid all fees and reasonable and documented out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable and documented fees and expenses of outside counsel and financial advisors) accrued and payable on or prior to the date of such Borrowing.. <br><br> *See* DIP Agreement § 4.02. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | LIBOR Eurocurrency (with a floor of 1.25%) plus 7.50% per annum, payable monthly in cash.  The default interest rate is an additional 2%.<br><br>Base Rate (with a floor of 2.25%) plus 6.50% per annum, payable monthly in cash.  The default interest rate is an additional 2%.<br><br>"Default Rate" means an interest rate equal to (a) the Base Rate *plus* (b) the Applicable Rate applicable to Base Rate Loans *plus* (c) 2.0% per annum; *provided* that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.<br><br>*See* DIP Agreement § 1.01.<br><br>Subject to the provisions of Section 2.08(b) of the DIP Agreement, each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.<br><br>Commencing (i) upon an Event of Default under Section 8.01(a), (f) or (g) or (ii) upon the occurrence and during the continuation of any Event of Default not described in the foregoing clause (i), Borrower shall pay interest on (x) the principal amount of the Loans and (y) to the extent then due and payable all other outstanding Obligations, in each case under clauses (x) and (y) at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand.<br><br>Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.<br><br>*See* DIP Agreement § 2.08. |
| **Use of DIP Facility and Cash Collateral**<br>**Bankruptcy Rule** 4001(b)(l)(B)(ii)<br>Local Rule 4001-2(a)(ii)<br><br><br>**Repayment Features**<br>Local Rule 4001-2(a)(i)(E) | The proceeds of any Credit Extension shall be used in a manner consistent with the uses set forth in the Preliminary Statements to the DIP Agreement and as set forth in the Budget.<br><br>*See* DIP Agreement §§ 5.17, 6.11.<br><br>Except as otherwise provided within the DIP Agreement or approved by the Administrative Agent and the Required Lenders (and regardless of whether or not a Carve Out Trigger Notice has been delivered), Borrower and its Subsidiaries shall not, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with the DIP Agreement, the Orders and the Budget (and any variances permitted hereunder), (ii) permit a disbursement causing any variance other than any variances permitted hereunder without the prior written consent of the Administrative Agent and the Required Lenders, or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments set forth in the Budget and authorized by the Bankruptcy Court.<br><br>Prior to the occurrence of an Event of Default, Borrower shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget and authorized to be paid under Sections |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable.  Upon the occurrence of an Event of Default and delivery of a Carve Out Trigger Notice (as defined in the Interim Order), the right of Borrower to pay professional fees of Case Professionals outside the Carve Out shall terminate, and Borrower shall provide immediate notice to all Case Professionals informing them that Borrower's ability to pay such Case Professionals is subject to and limited by the Carve Out. <br><br> *See* DIP Agreement § 7.15. <br><br> <u>Repayment of Delayed Draw Term Loans</u>.  Borrower shall repay to the Administrative Agent for the ratable account of the Delayed Draw Term Lenders the outstanding aggregate principal amount of all Loans on the Maturity Date. <br><br> *See* DIP Agreement § 2.07. |
| **Entities with Interests in Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(i) | The lenders party to the Prepetition Credit Agreement dated July 11, 2014. <br><br> *See* DIP Agreement Preamble; Interim DIP Order Preamble. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(ii) | Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing (including in the Fee Letter and the Agent Fee Letter) in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between Borrower and the applicable Agent). <br><br> *See* DIP Agreement § 2.09(a)–(b). |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) <br> Local Rule 4001-2(a)(ii) | The use of cash and proceeds from the DIP Facility is subject to the Budget, attached to the Interim DIP Order as Exhibit A. <br><br> *See* DIP Agreement §§ 5.17, 6.11; Interim DIP Order ¶¶ 13-14, 30. |
| **Reporting Information** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(ii) | The DIP Agreement requires compliance with certain reporting covenants that are usual and customary for DIP financings, including, without limitation, delivery of schedules, assignments, financial statements, insurance policies, and endorsements, weekly reports of receipts and budgeted cash usage; and such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of any of the Debtors' estates. <br><br> *See* DIP Agreement §§ 6.01–6.03; Interim DIP Order ¶¶ 13, 23, 34. |
| **Variance Covenant** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(ii) | For any week, commencing with the third week following the Petition Date: <br><br> (a)  Borrower shall not permit Adjusted Operating Cash Flow (as defined in the Budget) on a cumulative basis to be less than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than the greater of (x) 15% of such amount set forth in the Budget for such period(s) and (y) $5,000,000. <br><br> (b)  Borrower shall not permit Total Adjusted Cash Receipts (as defined in the Budget) less intercompany receipts on a cumulative basis to be less than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than (i) for week 3, 15%, (ii) for week 4, 12.5%, (iii) for weeks 5 and 6, 10% and (iv) for week 7, 7.5% and (v) for each week thereafter, 5%, in each case as compared to such amount set forth in the Budget for such period(s). |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | (c)   Borrower shall not permit Total Adjusted Cash Disbursements (as defined in the Budget) less intercompany disbursements on a cumulative basis to be greater than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than (i) for weeks 3 and 4, 10%, (ii) for weeks 5, 6 and 7, 7.5% and (iii) for each week thereafter, 5%, in each case as compared to such amount set forth in the Budget for such period(s). |
| | (d)   Borrower shall not permit Intercompany Disbursements (as defined in the Budget) from North America to the Republic of South Africa, Germany and Hungary (on a collective basis) on a cumulative basis to be greater than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 15% as compared to such amount set forth in the Budget for such period(s). |
| | For any month, commencing with the month ending October 31, 2017, Borrower shall not permit the fees and expenses of the Case Professionals incurred during any month to be greater than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 10% as compared to such amount set forth in the Budget for such period(s). |
| | *See* DIP Agreement §§ 7.15(c),(d); Interim DIP Order ¶ 14. |
| **Sale Milestones** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | • On the Petition Date, the Loan Parties shall file a motion seeking approval of the DIP Facility; <br><br> • On or before three (3) days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court; <br><br> • On or before thirty-five (35) days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court; <br><br> • On or before ten (10) days after the Petition Date, the Loan Parties shall have filed a motion with the Bankruptcy Court seeking approval of a 363 Sale (including approval of the right of the Lenders and the Prepetition Parties to "credit bid" for or otherwise purchase the Loan Parties and their Subsidiaries), approval of such sale to the Stalking Horse Bidder (subject to higher and better offers), if any, and bid protections, sale procedures and auction procedures in connection therewith, in form and substance satisfactory to the Administrative Agent (the "Sale Motion"); <br><br> • On or before the Petition Date, the Loan Parties shall have begun to solicit bids from potential bidders in the 363 Sale including resoliciting bids from potential buyers contacted by the Loan Parties prior to the Petition Date; <br><br> • On or before thirty-five (35) days after the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent, approving bid protections, sale procedures and auction procedures in connection with the 363 Sale and of the bid of the Stalking Horse Bidder; <br><br> • On or before seventy-one (71) days after the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent, granting the Sale Motion in form and substance satisfactory to the Administrative Agent and Required Lenders; and <br><br> • On or before seventy-eight (78) days after the Petition Date, the Loan Parties shall have consummated the 363 Sale. <br><br> *See* DIP Agreement § 8.01(n). |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | (a)  Upon the entry of each of the Orders, Borrower's and each other Debtors' Obligations under the DIP Documents shall, at all times: <br><br>(i)  constitute an allowed DIP Superpriority Claim on a joint and several basis in the Case of such Debtor; <br><br>(ii)  subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by first priority, valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, all Collateral that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens (excluding any Avoidance Actions (but including, following the entry of the Final Order, the proceeds therefrom)); <br><br>(iii)  pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable and fully-perfected security interests in, and Liens upon, the Collateral, whether existing on the Petition Date or thereafter acquired, that is subject to Liens of parties other than the Prepetition Parties, Liens securing the Adequate Protection Liens of the Prepetition Parties, the Carve Out or any Permitted Lien (as defined in the Interim Order), which security interests and liens in favor of the Administrative Agent, are junior to such valid, perfected and non-avoidable Liens; <br><br>(iv)  pursuant to section 364(d) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, fully perfected first priority senior priming security interests and Liens upon all Collateral that is subject to valid, perfected and non-avoidable liens presently held for the benefit of  the Prepetition Parties (such priming liens, the "<u>Priming Liens</u>" and such primed liens of the Prepetition Parties, the "<u>Primed Liens</u>").  The Priming Liens shall be senior in all respects to the Primed Liens and to the interests in property of the Pre-Petition Parties (including any and all forms of adequate protection granted to the foregoing).  The Primed Liens shall be primed and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subordinate as of the Petition Date; and <br><br>(v)  be secured by any Indebtedness of and Restricted Subsidiary that is not a Loan Party owing to a Loan Party postpetition evidenced by one or more promissory notes (which may be a global intercompany note) in form and substance reasonably acceptable to the Administrative Agent. <br><br>(b)  The Liens of the Administrative Agent described in section 6.18(a) of the DIP Agreement and the DIP Superpriority Claim shall have priority over any claims arising, upon entry of the Final Order, under sections 105 and 506(c) of the Bankruptcy Code, and shall be subject only to the Carve Out, and other Permitted Liens (as defined in the Interim Order).  Except as set forth herein, no other claim having priority superior to or *pari passu* with that granted to the Secured Parties by the Interim Order then in effect shall be granted or approved while any Obligations under the DIP Agreement remain outstanding. <br><br>(c)  Except for the Carve Out, no costs or expenses of administration shall be imposed against the Administrative Agent, the Lenders, or any other Secured Party or any of the Collateral or, subject to the entry of the Final Order, under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the Debtors hereby waives for itself and on behalf of its estate and all rights under section 105 and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Administrative Agent, the Lenders, or any Secured Party. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | (d)  Except for the Carve Out, the DIP Superpriority Claims of the Secured Parties and the Prepetition Parties shall at all times be senior to the rights of such Debtor, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, postpetition counterparties and other postpetition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of such Debtor's cases are converted to cases under chapter 7 of the Bankruptcy Code). <br><br> (e)  For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve Out shall be senior to all liens securing the Obligations as well as any Adequate Protection Liens and claims granted by any Order.  Nothing within the DIP Agreement shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation of any professional retained by any Debtor or a Committee.  Notwithstanding anything within the DIP Agreement to the contrary, prior to an Event of Default, the Debtors shall, in accordance with the Budget and subject to the terms of the Orders and any other relevant orders of the Bankruptcy Court, be permitted to pay compensation and reimbursement of expenses to professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code and such orders of the Bankruptcy Court authorizing the payment of compensation and reimbursement of expenses that have been incurred prior to the occurrence of such Event of Default, and such amounts paid will not reduce the Post-Carve Out Trigger Notice Cap. <br><br> *See* DIP Agreement § 6.18; Interim DIP Order Preamble, ¶ 8. |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(i)(f) | (a)  The "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the official committee of unsecured creditors, if any  (the "<u>Creditors' Committee</u>"),pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. <br><br> (b)  <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Credit Agreement, in an amount equal to the then unpaid amounts of the Allowed Professional |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
| --- | --- |
| | Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors for DIP Loans under the DIP Agreement (on a pro rata basis based on the then outstanding DIP Loans), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility; provided, however, that no DIP Lender shall be required to make DIP Loans in excess of its DIP Loan Commitment.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Lenders in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Lenders in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Documents or the Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 7, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7, prior to making any payments to the DIP Agent or the Prepetition Lenders, as applicable.  Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in the Interim Order, (i) disbursements by the |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Agreement, or in the Prepetition Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Credit Agreement Indebtedness. |
| | (c)  No Direct Obligation To Pay Allowed Professional Fees.  The DIP Agent and DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in the Interim Order or otherwise shall (i) be construed to obligate the DIP Agent or the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement or (ii) require any DIP Lender to make DIP Loans in excess of its DIP Loan Commitment. |
| | (d)  Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out. |
| | (e)  Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law. |
| | *See* Interim DIP Order ¶ 7. |
| **506(c) Waiver** Bankruptcy Rule 4001(c)(l)(B)(x) Local Rule 4001-2(a)(i)(C) **Section 552(b)** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(i)(h) | Subject to and effective only upon entry of the Final Order, and except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agent, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties.  In no event shall the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties be subject to (a) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (b) the equitable doctrine of "marshaling," or any other similar doctrine with respect to the Collateral. |
| | *See* Interim DIP Order ¶ 15. |
| **Stipulations to Prepetition Liens** | Pursuant to paragraph D and paragraphs 7 through 9 of the Interim Order, the Debtors make certain customary admissions and stipulations with respect to the aggregate amount |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br>Local Rule 4001-2(a)(i)(B)<br><br><br>**Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i)(B) | of the prepetition debt and the extent, validity, enforceability, and priority of the liens and security interests securing the Prepetition Collateral.<br><br>*See* Interim DIP Order ¶¶ D, 7–9.<br><br><u>Effect of Stipulations on Third Parties</u>.  The stipulations and admissions contained in paragraph D of the Interim Order shall be binding on the Debtors and all parties in interest, including, without limitation, any Committee, unless, and solely to the extent that an adversary proceeding or other contested matter has been commenced by a party in interest (other than the Debtors) with the requisite standing and authority, against the Prepetition Secured Parties in connection with any matter related to the Prepetition Credit Agreement, (a) in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing other than the Committee (if any), no later than seventy-five (75) days from the date of entry of this Interim Order, and (b) in the case of an adversary proceeding or other contested matter filed by the Committee (if any), no later than sixty (60) days after the appointment of the Committee (if any) (the "<u>Challenge Deadline</u>").  The Challenge Deadline may be extended in writing from time to time in the sole discretion of the Prepetition Agent (with respect to the Prepetition Credit Agreement) or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline.  If no such adversary proceeding or contested matter is filed by the Challenge Deadline**,** then the (a) stipulations and admission contained in paragraph D of the Interim Order shall become binding on all parties in interest, including, for the avoidance of doubt, any Committee appointed in the Case, (b) Prepetition Credit Agreement Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 case, (c) Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph D, not subject to defense, counterclaim, recharacterization, subordination or avoidance, and (d) Prepetition Credit Agreement Indebtedness and the Prepetition Liens shall not be subject to any other or further challenge by the Debtors, any Committee, or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto).  If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraph D of the Interim Order shall nonetheless remain binding and preclusive on the Debtors, any Committee, and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such timely filed adversary proceeding or contested matter.  Nothing in the Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee or any other official committee that may be appointed in these Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Prepetition Credit Agreement Indebtedness or the Prepetition Liens.<br><br>*See* Interim DIP Order ¶ 29. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | <u>Prepetition Secured Parties' Adequate Protection</u>.  The Prepetition Secured Parties are entitled, until the indefeasible repayment of the Prepetition Credit Agreement Indebtedness, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value of their respective interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value or actual consumption) of |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Cash Collateral and any other Prepetition Collateral, the priming liens on the Prepetition Collateral granted to the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and in each case to the extent required by the Bankruptcy Code (each, a "Diminution Claim").  As adequate protection for such Diminution Claims, the Prepetition Secured Parties are granted, *nunc pro tunc* as of the Petition Date, the following adequate protection (collectively, the "Adequate Protection Provisions"): <br><br> (a)  Adequate Protection Liens.  As adequate protection of the interests of the Prepetition Agent and the Prepetition Lenders in the Prepetition Credit Agreement Collateral for their Diminution Claims, the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, is hereby granted valid and perfected replacement security interests in and liens on the DIP Collateral, (the "Adequate Protection Liens"), subordinate only to the liens in favor of (i) the DIP Facility and (ii) the Carve Out. <br><br> (b)  Section 507(b) Claim.  To the extent that the Adequate Protection Liens are insufficient for a Prepetition Secured Party's Diminution Claim, pursuant to section 507(b) of the Bankruptcy Code the Prepetition Secured Parties are hereby granted, allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Adequate Protection Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, but subject to the payment of the Carve Out, the DIP Superpriority Claims and the DIP Obligations. <br><br> (c)  Interest, Fees, and Expenses.  Without further application to this Court, the Debtors are authorized and directed to pay forthwith in cash (i) all accrued and unpaid interest through the Petition Date owed under the Prepetition Credit Agreement including, without limitation, payment of all outstanding default interest); (ii) all accrued and unpaid fees and disbursements owed to the Prepetition Agent, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition Agent, as provided under the Prepetition Credit Agreement, as applicable and, in each case, whether incurred before or after the Petition Date and (iii) current monthly payment of all accrued but unpaid fees, costs, expenses, and interest; *provided, however,* that interest shall be paid at the applicable non-default contract rate; *provided, further, however,* that all claims for default interest shall be fully preserved. <br><br> (d)  Payment of Prepetition Secured Parties' Professional Fees and Expenses.  The Debtors shall pay the Prepetition Secured Parties' Professional Fees and Expenses within ten (10) business' days (if no written objection is received within such ten (10) business day period) after such professional has delivered an invoice substantially in the form provided to the Debtors to date describing such fees and expenses; *provided, however,* that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoices to the DIP Agent, the U.S. Trustee, and the Committee (if appointed).  Written objections to payment of such fees and expenses, which may only be asserted by the Debtors, the DIP Agent, the U.S. Trustee and the Committee (if appointed), must contain a specific basis for the objection and quantification of the undisputed amount of the fees and expenses invoiced; failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice.  None of the such fees |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | and expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided however*, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.<br><br>*See* DIP Agreement § 7.01; Interim DIP Order ¶ 18. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Agreement contains the following events of default:<br><br>(a)  Non-Payment.  Any Loan Party fails to pay (i) when and as required to be paid within the DIP Agreement, any amount of principal of any Loan or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable under the DIP Agreement or with respect to any other Loan Document; or<br><br>(b)  Specific Covenants.  Parent, Holdings or Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a) or Section 6.04(a) (solely with respect to Parent, Holdings or Borrower), Section 6.11, Section 6.13, Section 6.16, Section 6.17 or Article VII; or<br><br>(c)  Other Defaults.  Any Loan Party fails to perform or observe the terms of any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for seven (7) days after receipt by Borrower of written notice thereof by the Administrative Agent or the Required Lenders; or<br><br>(d)   Representations and Warranties.   Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or<br><br>(e)  Cross-Default.  Except as a result of the commencement of the Cases or unless payment, acceleration and/or the exercise of rights and remedies as a result thereof (as applicable) is stayed by the Bankruptcy Court, any Loan Party or any Subsidiary (i) fails to make any payment beyond the applicable grace period with respect thereto (or in the case of Indebtedness under the SRL Financing Agreement, within five (5) Business Days following the expiration of any such grace period), if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than (A) Indebtedness hereunder and (B) Indebtedness in respect of secured Indebtedness permitted hereunder that becomes due as a result of a Disposition of the property securing such Indebtedness pursuant to the terms of such Indebtedness and such Indebtedness is repaid in accordance therewith and such proceeds are otherwise applied in accordance with this Agreement) having an aggregate principal amount of not less than the Threshold Amount, or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, after giving effect to any grace period and with the giving of notice if required, all such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (e)(ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted under the DIP Agreement and under the documents providing for such |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Indebtedness; *provided further* that such failure is unremedied and is not waived by the holders of such Indebtedness, or in the case of the SRL Financing Agreement, such failure is unremedied and is not waived by the holders of such Indebtedness within ten (10) Business Days; or |
| | (f) <u>Insolvency Proceedings, Etc</u>. Any Restricted Subsidiary that is not a Debtor institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or an order for relief is entered in any such proceeding; or |
| | (g) <u>Inability to Pay Debts</u>. Any Restricted Subsidiary that is not a Debtor becomes unable or admits in writing its inability or fails generally to pay its debts as they become due; or |
| | (h) <u>Judgments</u>.  There is entered against any Loan Party or any Restricted Subsidiary after the Petition Date a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance), or any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in each case, such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of thirty (30) consecutive days, or enforcement of such judgment is not subject to the automatic stay provided by the Bankruptcy Code; or |
| | (i) <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or ERISA Affiliate under Title IV of ERISA in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, (iii) any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or (iv) a termination, withdrawal or noncompliance with applicable law or plan terms or termination, withdrawal or other event similar to an ERISA Event occurs with respect to a Foreign Plan that could reasonably be expected to result in a Material Adverse Effect; or |
| | (j) <u>Invalidity of Collateral Documents</u>.  Any material provision of the Guaranty or any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction |

19

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
|  | permitted under Section 7.04 or Section 7.05 of the DIP Agreement) or as a result of acts or omissions by the Administrative Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect or in the case of the Collateral Documents ceases to create a valid and perfected first priority lien on the Collateral covered thereby; or any Loan Party contests in writing the validity or enforceability of any material provision of the Guaranty or any Collateral Document; or any Loan Party denies in writing that it has any or further liability or obligation under the Guaranty or any Collateral Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind the Guaranty or any Collateral Document; or<br><br>(k)    Subordination Provisions.    (i) Any subordination provisions of subordinated Indebtedness (the "Subordination Provisions"), shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any lender or holder in respect of such Indebtedness and that would result in such Indebtedness not being treated as subordinated or (ii) any Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Administrative Agent and the Secured Parties or (C) that all payments of principal of or premium and interest on such subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or<br><br>(l)  Change of Control.  There occurs any Change of Control; or<br><br>(m)  Cases, Motions, Etc.  Any of the following shall occur in any Case:<br><br>(i)  the dismissal of the Cases or the entry of an order converting the Cases to a Chapter 7 proceeding under the Bankruptcy Code, or filing of a reorganization plan that is not approved by the Administrative Agent and the Required Lenders, or if any Loan Party applies for, consents to, or acquiesces in, such above relief;<br><br>(ii)  entry of an order appointing a Chapter 11 trustee or examiner, or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party;<br><br>(iii)  the dissolution of any Loan Party;<br><br>(iv)  (A) failure by any Loan Party to perform under any Order in any material respect, (B) any failure of the applicable Order to remain in full force and effect or (C) any breach by any Loan Party of any material term or condition of the applicable Order that continues beyond any applicable cure period;<br><br>(v)    entry of an order staying, reversing or otherwise modifying (other than immaterial modifications to correct grammatical or typographical errors), in each case without the prior consent of the Required Lenders, the Facility, any Order or any order entered in connection with the Sale Motion or the 363 Sale;<br><br>(vi)  the sale, liquidation or other disposition of all, or substantially all, of the Collateral, whether pursuant to Section 363 of the Bankruptcy Code, any plan of reorganization or liquidation or otherwise, or entering into any agreement to effectuate any of the foregoing by the Loan Parties, unless the obligations under the Facility have been paid in full and the commitments thereunder have been terminated (or will be paid and terminated on the consummation of such transaction);<br><br>(vii) entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting of a deed in lieu of |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | foreclosure or similar relief) on any assets of the Loan Parties having a value in excess of the Threshold Amount without the consent of the Required Lenders; |
| | (viii)  (A) entry of an order granting other super-priority liens or administrative expense claims with priority over or *pari passu* with the liens granted in connection with the Facility, (B) the Administrative Agent shall fail to have a first priority perfected security interest in the Collateral, except for the Carve Out or (C) any loss of the Collateral with a market value or book value in excess of the Threshold Amount; |
| | (ix)  the payment of, or filing of a motion or other pleading by any Loan Party for authority to pay, any pre-petition claim or administrative expense except as may be provided for in the Orders, the First Day Orders (as permitted by the Budget or agreed by the Administrative Agent and the Required Lenders in their reasonable discretion), the Budget or the Loan Documents or as may be approved by the Bankruptcy Court as payments to critical vendors pursuant to a critical vendor or foreign vendor motion and order acceptable to the Administrative Agent and the Required Lenders in their sole and absolute discretion or the filing of a motion by any Loan Party (or any party in interest or the committee or any other person) that is not dismissed or denied within thirty (30) days after the date of the filing of such motion, or the entry of any order in the Cases permitting recovery from any portion of the Collateral (or from Administrative Agent or any Lender) of any costs or expenses of preserving or disposing of Collateral under Section 506(c) or 552(b) of the Bankruptcy Code (or otherwise); |
| | (x)  entry of an order granting payment of, or granting adequate protection with respect to, prepetition Indebtedness, other than as expressly set forth in the Orders and the Budget; or |
| | (n)  <u>Milestones</u>.  The failure to meet any of the Milestones. |
| | (o)  <u>Violations of Criminal Law</u>.  Indictment of any Loan Party under any applicable law where the crime alleged would constitute a felony under applicable law and such indictment remains unquashed or such legal process remains undismissed for a period of thirty (30) days or more; or |
| | (p)  <u>SRL Agreements</u>.  (i) Termination of any agreement between Parent or any Restricted Subsidiary and SRL or any of its Affiliates (other than the SRL Financing Agreement and the related documentation entered into in connection therewith) without an alternative sourcing plan acceptable to the Administrative Agent and the Required Lenders in their sole and absolute discretion, (ii) Parent or any Restricted Subsidiary enters into any agreement with SRL or any of its Affiliates without the consent of the Administrative Agent and the Required Lenders or (iii) non-compliance by SRL or such Affiliate with any agreement entered into with Parent or any of its Restricted Subsidiaries for a period exceeding ten (10) Business Days after Parent or any of its Restricted Subsidiaries provide notice to SRL or such Affiliate thereof; or |
| | (q)  <u>Customer Accommodation Agreements</u>.  Any Loan Party (and/or an Affiliate thereof) enters into a customer accommodation agreement or any associated agreement not constituting an Acceptable Customer Accommodation Agreement without the consent of the Administrative Agent and the Required Lenders. |
| | *See* DIP Agreement § 8.01; Interim DIP Order ¶ 31. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and DIP Lenders to exercise upon not less than five (5) days' prior written notice to the Debtors (with a copy to counsel to the Prepetition Agent, the Committee, counsel to any other official committee that may be appointed in these Cases, and the U.S. Trustee) following the occurrence and continuance of an Event of Default (as defined in the DIP Agreement), all rights and remedies hereunder and under the DIP Documents against the Debtors and/or the DIP Collateral (including, without limitation, the right to set off monies of the Debtors in accounts maintained or controlled by the DIP Agent or any DIP Lender). *See* Interim DIP Order ¶ 11. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | <u>Perfection of DIP Liens and Adequate Protection Liens</u>. The DIP Agent, the DIP Lenders, and the Prepetition Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent, the DIP Lenders, or the Prepetition Agent choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order, but subject in all respects to the provisions of the Interim Order. *See* Interim DIP Order ¶ 21. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Whether or not the transactions contemplated hereby are consummated, Borrower shall indemnify and hold harmless the Lead Arranger, each Agent-Related Person, each Lender and their respective Affiliates, directors, officers, employees, counsel, agents, advisors, and other representatives (collectively, the "<u>Indemnitees</u>") from and against any and all losses, liabilities, damages, claims, and reasonable and documented or invoiced out-of-pocket fees and expenses (including reasonable Attorney Costs of one counsel for all Indemnitees and, if necessary, one firm of local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all Indemnitees (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee)) of any such Indemnitee arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnitees is a party thereto and whether or not such proceedings are brought by Borrower, its equity holders, its Affiliates, creditors or any other third person) that relates to the Transactions, including the financing contemplated hereby) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment or Loan or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability related in any way to Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or controlling Persons or any of the officers, directors, employees, agents, advisors or members of any of the foregoing, in each case who are involved in or aware of the Transactions (as determined by a court of competent jurisdiction in a final and non-appealable decision), (y) a material breach of the Loan Documents by such Indemnitee or one of its Affiliates (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (z) disputes solely between and among such Indemnitees to the extent such disputes do not arise from any act or omission of Borrower or any of its Affiliates (other than with respect to a claim against an Indemnitee acting in its capacity as an Agent or Lead Arranger or similar role under the Loan Documents unless such claim arose from the gross negligence, bad faith or willful misconduct of such Indemnitee). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date). In the case of an investigation, litigation or other proceeding to which the indemnity in this section applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, managers, partners, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this section shall be paid within ten (10) Business Days after demand therefor; *provided*, *however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this section. The agreements in this section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this section shall not apply to Taxes other than Taxes that represent liabilities, obligations, losses, damages, etc., with respect to a non-Tax claim. *See* DIP Agreement § 10.05; Interim DIP Order ¶ 5. |
| **Liens on Avoidance Actions** Local Rule 4001-2(a)(i)(D) | The DIP Collateral includes all tangible and intangible prepetition and postpetition property and interests in property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, including, without limitation, (a) all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, intellectual property, instruments, insurance, inventory, investment property, letter-of-credit rights, money and any supporting obligations related thereto; (b) all commercial tort claims; (c) all books and records pertaining to the Collateral; (d) all property of any Prepetition Credit Party held by the DIP Agent, the DIP Lenders, or any Prepetition Secured Party, including all property of every description, in the custody of or in transit to the DIP Agent, the DIP Lenders or any Prepetition Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such party or as to which such party may have any right or power, including, but not limited to cash; (e) all other goods (including, but not limited to, fixtures) and personal property, whether tangible or intangible and wherever |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | located; (f) all owned or leased real estate and real property leaseholds; (g) any Indebtedness of and Restricted Subsidiary that is not a Loan Party owing to a Loan Party postpetition evidenced by one or more promissory notes (which may be a global intercompany note) in form and substance reasonably acceptable to the Administrative Agent; and (h) all proceeds of the foregoing (the "Postpetition Collateral"), plus all Prepetition Collateral. The DIP Collateral shall exclude the Debtors' Avoidance Actions, but, subject to and effective only upon entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise. |
| | *See* Interim DIP Order ¶ 9. |

### Jurisdiction and Venue

12.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

**Relief Requested**

15.     The Debtors request that the Court:

> a.      authorize the Debtors to obtain the DIP Facility consisting of $25 million of secured financing on an interim basis and $40 million in aggregate on a final basis subject to and pursuant to the terms and conditions set forth in the Interim DIP Order, the Final DIP Order, and the DIP Agreement;

> b.      authorize the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

> c.      authorize the Debtors to (i) grant the DIP Lenders superpriority administrative claims and all other benefits and protections allowable under sections 507(b) and 503(b)(1) of the Bankruptcy Code, senior in right to all other administrative claims against the Debtors' estates, except for the Carve Out and (ii) pursuant to sections 364(d)(i), (c)(2), and (c)(3) of the Bankruptcy Code, perfected first priority claims, priming liens, and security interests in the DIP Collateral and Prepetition Collateral, subject only to the Prior Liens (if any) and the Carve Out;

> d.      authorize the Debtors to (i) use Cash Collateral (as defined in the Interim DIP Order) to the extent required herein, and (ii) provide adequate protection, solely to the extent provided herein, to the lenders from time to time party thereto (the "Prepetition Lenders") under that certain Amended and Restated Credit Agreement, dated as of July 11, 2014, by and among GST AutoLeather, Inc., as borrower, the Guarantors party thereto, Royal Bank of Canada, as administrative agent (the "Prepetition Agent," and together with the DIP Agent, collectively, the "Agent"), and the lenders from time to time party thereto (in such capacity, the "Prepetition Lenders") on account of the Debtors' use of Cash Collateral and any other Prepetition Collateral;

> e.      authorize the Agent to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Agreement);

> f.      subject to entry of the Final DIP Order, authorize the Debtors to grant liens to the DIP Lenders on the proceeds of the Avoidance Actions (as defined herein) (but not, for the avoidance of doubt, on the Avoidance Actions themselves);

g.      subject to entry of the Final DIP Order, waive the Debtors' right to surcharge against the DIP Collateral (as defined in the Interim DIP Order) or, solely to the extent set forth herein, the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

h.      schedule the Final Hearing for a date that is before the 25th day after the Petition Date to consider entry of the Final DIP Order authorizing the borrowings under, and the Debtors' entry into, the DIP Agreement on a final basis and approval of notice procedures with respect thereto; and

i.      lift the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders.

## I.      The Debtors' Prepetition Capital Structure.

16.      As of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations (the "Prepetition Debt Obligations") totaled approximately $196 million, comprised of:   (a) approximately $164 million of obligations under the Prepetition Credit Agreement (as defined herein) and  (b) approximately $32 million of obligations under the Mezzanine Loan (as defined herein).

### A.      The Prepetition Credit Agreement.

17.      On July 11, 2014, the Debtors entered into the Credit Agreement by and among GST, as borrower, Royal Bank of Canada, as administrative agent, and the lenders from time to time party thereto (the "Prepetition Credit Agreement").   The Prepetition Credit Agreement provides term B loans in an initial principal amount equal to $150 million and a revolving credit facility in an initial principal amount up to $24 million.   The Prepetition Credit Agreement is secured by liens in substantially all of the Debtors' assets, including that certain master intercompany note, dated as of July 11, 2014, by and among GST AutoLeather Cayman II, Ltd. ("Cayman II"), GST AutoLeather Cayman I, Ltd. ("Cayman I"), GST, and certain of GST's subsidiaries.   Additionally, the Prepetition Credit Agreement is fully and unconditionally

26

guaranteed by GST, Cayman I, Cayman II, and Strategic Financial LLC, a wholly owned subsidiary of GST ("Strategic Financial"). The revolving credit facility accrues interest at a rate of 5.50/4.50 percent for Eurocurrency and base rate loans, respectively, payable monthly, and matures on July 11, 2019. The term B loans accrue interest at a rate of 5.50/4.50 percent for Eurocurrency and base rate loans, respectively, payable quarterly, and matures on July 11, 2020.

18.     As of July 31, 2017, the maximum availability under the Prepetition Credit Agreement had decreased to approximately $164 million, with approximately $140 million and $24 million between the term B loans and revolving credit facility, respectively. As of the Petition Date, the Debtors had fully drawn the revolving credit facility.

19.     As discussed in the First Day Declaration, the Debtors entered into a forbearance agreement with respect to the Prepetition Credit Agreement on September 6, 2017. The forbearance agreement included a 0.5 percent forbearance fee on all of the Debtors' outstanding borrowings under the Prepetition Credit Agreement. The Debtors elected to increase the Prepetition Credit Agreement's principal balance in lieu of a cash payment of the forbearance fee. As of the Petition Date, the Prepetition Credit Agreement has accrued approximately $0.8 million of paid in kind fees.

**B.     The Mezzanine Loan.**

20.     On July 11, 2014, the Debtors entered into that certain Loan Agreement by and among GST, as borrower, and the lenders from time to time party thereto (the "Mezzanine Loan"), pursuant to which the Company incurred approximately $30 million of initial principal indebtedness. The Mezzanine Loan accrues interest at a rate of 13.0 percent payable annually, between 11.0 percent cash interest and 2.0 percent paid-in-kind interest and matures on January 11, 2021. The Mezzanine Loan is unsecured and is fully and unconditionally guaranteed by GST, Cayman I, Cayman II, and Strategic Financial. Moreover, pursuant to that certain

subordination agreement, dated as of July 11, 2014, the Mezzanine Loan is subordinate to the Prepetition Credit Agreement. The Mezzanine Loan has accrued approximately $2 million of paid-in-kind interest as of the Petition Date.

### C.    Factoring Facilities.

21.    Certain of the Debtors are party to a factoring facility with Branch Banking and Trust Company ("BB&T"), pursuant to which BB&T purchases certain of the Debtors' receivables in North America. The Debtors and BB&T entered into the factoring agreement in May 4, 2015 (as amended, the "Factoring Facility"). The Factoring Facility provides the Debtors with advances up to $10 million in consideration for BB&T's purchase of certain of the Debtors' receivables. Pursuant to the Factoring Facility, BB&T earns a factoring commission in the amount of 0.3 percent of the gross amount of each account factored thereunder, which amount is charged on the date such account is purchased by BB&T. Given the Debtors' position at the beginning of the supply chain and the length of time it takes from when product is sent to customers and when payment for that product is received by the Debtors, the Factoring Facility provides the Debtors with certainty regarding the timing and amount of cash flows and is a vital component of their business operations.

### D.    SRL Facility.

22.    GST and three non-Debtor foreign affiliates are parties to that certain Debt Confirmation Agreement dated as of September 20, 2017 by and between Richina Leather Industrial Co., Ltd. ("RLI"), Zhongshan GST Autoleather Co., Ltd. ("GST Zhongshan"), GST (Shenyang) Autoleather Co., Ltd. ("GST Shenyang"), GST (Jiaxing) Autoleather Co., Ltd. ("GST Jiaxing" and, together with GST Zhongshan and GST Shenyang, the "PRC Entities"), and GST Autoleather Inc. (the "Debt Confirmation Agreement"), pursuant to which RLI, a supplier of leather finishing services for the Company's Chinese operations, agreed to continue providing

goods and services on credit not to exceed $7 million.  RLI is the Company's sole supplier of finishing services in China and integral to the Company's Chinese operations.  The Debt Confirmation Agreement is secured by mortgages on certain equipment of GST Zhongshan and GST Shenyang and pledges of the equity in each of the PRC Entities.  As of the Petition Date, the Company has utilized approximately $4.1 million of the total outstanding credit available under the Debt Confirmation Agreement.

### E.    Equity.

23.    The majority of the Company's outstanding equity is owned by Advantage Partners.  A minority portion of the Company's outstanding equity is owned by the Pacific Alliance Group (PAG) and certain members of management, who made equity investments in the Company.

## II.    The Debtors Have an Immediate Need for Cash.

24.    The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.  As of the Petition Date, the Debtors' total cash balance is approximately $1.5 million, which is insufficient to operate their enterprise and continue paying their debts as they come due.  Without prompt access to postpetition financing and to cash collateral, the Debtors will be unable to pay wages for their employees, pay vendors to supply necessary goods and services, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  *See* Cohen  Decl. ¶¶ 10–11.

## III.    Alternative Sources of Financing Are Not Readily Available.

25.    The Debtors do not believe it would prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity.  However, the Debtors do not have a variety of sources of financing readily available.  The Debtors'

Prepetition Lenders assert that substantially all of the Debtors' existing collateral is encumbered under their existing capital structure, which restricts the availability of, and options for, postpetition financing. *See* Cohen Decl. ¶¶ 14, 22. As a result, the Debtors do not believe third-party debtor in possession financing would be reasonably obtainable.

26.    In June 2017, following an 11-month marketing process and in the face of increasing concerns regarding feasibility of a sale transaction, the Debtors sought external strategic advice and assistance, engaging Lazard as financial advisor and Kirkland & Ellis LLP ("K&E") as legal advisor. Later, on July 9, 2017, the Debtors retained Alvarez & Marsal North America, LLC ("A&M") as restructuring advisor. The advisors were retained to assist the Debtors with exploring strategic alternatives.

27.    In July 2017, the Debtors initiated a competitive marketing process designed to secure postpetition financing on the best available terms. As part of this process, Lazard solicited proposals for DIP financing from six parties in addition to the Prepetition Lenders, Mezzanine Lenders, and the Debtors' sponsor. With regard to the six alternative lenders contacted, the lenders expressed concern with providing the DIP financing because, among other things, the Debtors' recent financial performance was negative, the Prepetition Lenders had a lien on substantially all of the Debtors' collateral, the amount of the DIP financing needed, and the fact that much of the Company's collateral was located outside of the U.S. Additionally, these potential lenders were not willing to engage in a priming fight with the Prepetition Lenders. Further, the Prepetition Lenders were unwilling to provide unsecured administrative credit, credit secured only by junior liens, or credit secured by foreign unencumbered assets. They were, however, willing to provide debtor in possession financing on a senior-secured basis. *See* Cohen Decl. ¶ 22.

28.     Following receipt of the Prepetition Lenders' proposal for the DIP Facility, the Debtors and the Prepetition Lenders entered into extensive, arm's-length negotiations regarding the terms and the amount of the proposed DIP Facility.  Following these negotiations, the Debtors and certain of the Prepetition Lenders reached an agreement on the terms of a $40 million priming DIP Facility that will provide the Debtors with sufficient capital to administer these chapter 11 cases.  The proposed DIP Facility includes a Budget, along with certain milestones and operational covenants, including delivery of schedules, assignments, financial statements, and weekly reports of receipts and budgeted cash usage.  The DIP Facility will provide the Debtors with sufficient liquidity to continue uninterrupted operations and bridge to the consummation of a sale transaction, and is in the best interests of all stakeholders.  *See* Cohen Decl. ¶¶ 16–17.

29.     In light of the foregoing, it is highly unlikely that any lender would be willing to provide DIP financing on more attractive terms to the Debtors than the Prepetition Lenders. Further, any third-party proposal would face the execution risk associated with a new lender transaction, including material timing and due diligence constraints, as well as a priming fight with the Prepetition Lenders, each of which would involve the payment of additional professional fees. In contrast, the proposed DIP Facility offered by the DIP Lenders allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.

## Basis for Relief

I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

A.     **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

30.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or

superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

31.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

32.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003)

(while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).   The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.   For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.   ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.***  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

33.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of available alternatives.   Specifically, and in the face of insufficient cash on hand, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and chapter 11 activities.   Further, while the Debtors' vendors historically have allowed the Debtors to purchase goods on credit, the Debtors' ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtors are not a credit risk.   The Debtors negotiated the DIP Agreement and other DIP

Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

34.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders perfected first priority claims, priming liens, and security interests in the DIP Collateral and Prepetition Collateral.

35.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

36.     As described above and as set forth in the Cohen Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' existing assets are encumbered under their existing capital structure.  In light of the foregoing and following discussions with potential lenders regarding potential postpetition financing, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  *See* Cohen Decl. ¶ 14.  Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases.  *See* Cohen Decl. ¶ 10.  Absent the DIP Facility, which will allow the Debtors to meet their working capital needs during these chapter 11 cases and consummate the proposed sale transaction, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreement, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

37.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit.

Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

38.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interests in collateral are adequately protected. Here, the Prepetition Lenders have consented to the DIP Facility. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

39.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d

1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

40.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure.  The Prepetition Lenders assert that substantially all of the Debtors' existing assets are encumbered under their existing capital structure.  *See* Cohen Decl. ¶ 14.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  *See* Cohen Decl. ¶¶ 15–17.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.      The Repayment Feature of the DIP Facility Under the Final DIP Order Is Appropriate.**

41.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

42.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this jurisdiction have approved similar DIP features, including on the first day of the case.  *See, e.g.*, *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP that included roll-up of approximately $250 million prepetition debt pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that included roll-up of approximately $48.6 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).[6]

43.     The roll up of $40 million of the Prepetition Credit Facility upon close of the DIP Facility is a sound exercise of the Debtors' business judgment.  For each $1 of DIP delayed draw commitments provided by the DIP Lender, $1 of the obligations owed to the DIP Lender under the Prepetition Credit Facility will be "rolled-up" into the DIP Facility.  The repayment of the

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Prepetition Credit Facility pursuant to the terms of the DIP Facility is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing.

44.    Absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  Further, the Prepetition Lenders are the only secured lenders in these cases.  Given these circumstances, repayment of the Prepetition Credit Facility is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**II.    The Debtors Should Be Authorized to Use the Cash Collateral.**

45.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

46.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will

dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

47.     As described more fully above, and as set forth in the Interim DIP Order, the Debtors propose to provide the Prepetition Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

a.   As adequate protection of the interests of the Prepetition Agent and the Prepetition Lenders in the Prepetition Credit Agreement Collateral for their Diminution Claims, the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, is hereby granted valid and perfected replacement security interests in and liens on the DIP Collateral, (the "Adequate Protection Liens"), subordinate only to the liens in favor of (i) the DIP Facility, and (ii) the Carve Out.

b.   To the extent that the Adequate Protection Liens are insufficient for a Prepetition Secured Party's Diminution Claim, pursuant to section 507(b) of the Bankruptcy Code the Prepetition Secured Parties are hereby granted, allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Adequate Protection Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have

recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, but subject to the payment of the Carve Out, the DIP Superpriority Claims, and the DIP Obligations.

c.      Without further application to this Court, the Debtors are authorized and directed to pay forthwith in cash (i) all accrued and unpaid interest through the Petition Date owed under the Prepetition Credit Agreement (including, without limitation, payment of all outstanding default interest); (ii) all accrued and unpaid fees and disbursements owed to the Prepetition Agent, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition Agent, as provided under the Prepetition Credit Agreement, as applicable and, in each case, whether incurred before or after the Petition Date; (iii) current monthly payment of all accrued but unpaid fees, costs, expenses, and interest; *provided*, *however*, that interest shall be paid at the applicable non-default contract rate; *provided*, *further*, *however*, that all claims for default interest shall be fully preserved.

d.      The Debtors shall pay the Prepetition Secured Parties' Professional Fees and Expenses within ten (10) business' days (if no written objection is received within such ten (10) business day period) after such professional has delivered an invoice substantially in the form provided to the Debtors to date describing such fees and expenses; *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoices to the DIP Agent, the U.S. Trustee, and the Committee (if appointed).  Written objections to payment of such fees and expenses, which may only be asserted by the Debtors, the DIP Agent, the U.S. Trustee and the Committee (if appointed), must contain a specific basis for the objection and quantification of the undisputed amount of the fees and expenses invoiced; failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice.  None of the such fees and expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided however*, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

48.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Lenders from any diminution in value to the Cash Collateral. In light of the foregoing, the Debtors further submit, and the Prepetition Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Lenders are appropriate.[7] Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

**III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Documents.**

49.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay an administrative and work fee to the DIP Agent, equal to $400,000 in the aggregate, and a commitment fee, underwriting fee, and exit fee to the DIP Lenders.

50.     It is understood and agreed by all parties, including the Debtors, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing.  *See* Cohen Decl. ¶¶ 20–21.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

---

[7]     Pursuant to the DIP Orders, the Prepetition Lenders are permitted to seek additional adequate protection in accordance with the terms thereof.

**IV.      The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

51.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

52.      As explained herein, in the Cohen Declaration, and in the First Day Declaration, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Agent and DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

53.      The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in

order to validate and perfect the liens and security interests granted to them under the Interim DIP Order. The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim DIP Order. Finally, the proposed Interim DIP Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

54.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

55.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

56.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final DIP Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  *See* Cohen Decl. ¶ 19.

### Request for Final Hearing

57.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 25 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

58.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

59.     The Debtors have provided notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the agent under the Debtors' first lien

credit facility and the Debtors' proposed debtor in possession credit facility; (d) counsel to the agent under the Debtors' mezzanine credit facility; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; and (g) the office of the attorneys general for the states in which the Debtors operate.  As this motion is seeking "first day" relief, within two Business Days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

60.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Wilmington, Delaware<br>Dated: October 3, 2017 | /s/ *Laura Davis Jones* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (*pro hac vice* admission pending)
Alexandra Schwarzman (*pro hac vice* admission pending)
Benjamin M. Rhode (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              ryan.bennett@kirkland.com
              alexandra.schwarzman@kirkland.com
              benjamin.rhode@kirkland.com

*Proposed Counsel to the Debtors*