# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GST AUTOLEATHER, INC., *et al.*,[1] | ) Case No. 17-12100 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING BID PROCEDURES FOR THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(II) SCHEDULING AN AUCTION AND HEARING TO CONSIDER
THE SALE, (III) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (IV) APPROVING CERTAIN EXPENSE REIMBURSEMENT
PROVISIONS AND BREAKUP FEE, AND (V) GRANTING RELATED RELIEF**

GST AutoLeather, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] state the following in support of this motion:

### Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"):

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  GST AutoLeather, Inc. (5289); GST AutoLeather Cayman I Ltd. (n/a); GST AutoLeather Cayman II Ltd. (n/a); GST AutoLeather HoldCo Corp. (4266); GST Innovations, LLC (5563); and Strategic Financial LLC (n/a).  The location of the Debtors' service address is:  20 Oak Hollow Drive, Suite 300, Southfield, Michigan 48033.

[2]      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jonathan Hickman, Chief Restructuring Officer of GST AutoLeather, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 4] (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on October 3, 2017 (the "Petition Date").  In addition, the Debtors submit the *Declaration of Jason A. Cohen in Support of the Debtors' Bid Procedures Motion* (the "Cohen Declaration"), attached hereto as **Exhibit B**.

(a)    approving the bid procedures (the "Bid Procedures") in connection with the sale of substantially all of the Debtors' assets (the "Assets"), including overbid provisions and authority for the Debtors to designate a "stalking horse" bidder subject to the parameters set forth in the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order;

(b)    establishing certain dates and deadlines, including the bid deadlines and the date of the auction (the "Auction");

(c)    scheduling a hearing (the "Sale Hearing") to approve the sale of the Assets to the highest or otherwise best bidder for the Assets or reorganized equity (the "Successful Bidder") and establishing deadlines for objections and responses to relief that will be requested in a sale motion (the "Sale Motion") that the Debtors will file prior to the Sale Hearing;

(d)    approving the form and manner of notice of the Auction and Sale Hearing as described herein; and

(e)    granting any related relief.

## Jurisdiction and Venue

2.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Local Rules 2002-1 and 9006-1.

### Preliminary Statement[3]

5.    The Debtors, together with their non-Debtor affiliates (the "Company"), are a leading global designer and manufacturer of automotive leather components. The Company supplies leather seating surfaces, headrests, and interior trim to a "who's who" list of tier-1 automotive suppliers and original equipment manufacturers, and consistently have held first or second market share positions with BMW, Fiat Chrysler Automobiles, General Motors Corp., Daimler AG, Porsche AG, Groupe PSA, and Toyota Motor Corp. The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids for the purchase of substantially all of the Debtors' Assets—a process that began prepetition, and that continues postpetition.

6.    This prepetition process began in 2015, when, as a result of its strong financial performance, the Company received an unsolicited, non-binding offer to purchase the Company from a foreign strategic buyer. Ultimately, the Company and the foreign buyer were unable to agree on deal terms, including transaction value and structure, and discussions ended in June of 2016. This led the Company to pursue a broad marketing process beginning in the summer of 2016, led by Lazard Middle Market LLC ("Lazard"), which generated interest from both strategic and financial buyers. As part of this process, the Debtors had contacted more than 90 potential strategic and financial buyers. More than 40 of these potentially interested parties signed nondisclosure agreements with the Debtors and received confidential information regarding the Company, including a confidential information memorandum prepared by the Debtors and their advisors. The Company received preliminary nonbinding indications of interest from ten parties in September 2016 and held management meetings with nine of these

---

[3]    Capitalized terms used in this Preliminary Statement but not defined herein shall have the meanings set forth elsewhere in the Motion.

parties in October 2016. The Company's efforts resulted in the receipt of nonbinding letters of intent from four parties in December 2016 and January 2017.

7.    Unfortunately, and as described in the First Day Declaration, the Company's financial performance declined during this time period, and the interest of would-be buyers waned. As a result, potential buyers either lowered their valuations, withdrew their bids, or opted to wait and see if the Company's performance improved. As of late May 2017, the Company was continuing discussions with three parties—two of whom had provided an indication of interest or letter of intent in 2016 and a newly interested strategic buyer, who had recently provided a letter of intent in April 2017. However, concerns about the Company's performance caused two of the three parties to drop out of the process in June and July. The Company was subsequently able to reengage one of those parties when the Company agreed to a non-exclusive letter of intent with the late-arriving strategic buyer at the end of July 2017. Discussions advanced towards executing binding documentation with the two remaining potential buyers throughout late summer of 2017, but neither potential buyer provided a binding offer for the purchase of the Company.

8.    The Debtors' deteriorating financial performance also imposed a severe liquidity strain on the Company, forcing the Debtors to seek funding to alleviate the shortfall from, among other sources, the lenders under the Debtors' senior secured credit facility (such lenders, the "Senior Secured Lenders," and such facility, the "Secured Credit Facility"). Unfortunately, the Debtors were unable to obtain sufficient out-of-court financing for a permanent solution. The negotiations with the Senior Secured Lenders turned instead to the possibility of funding the Debtors' business operations as well as an in-court sale or recapitalization process through a chapter 11 restructuring. This led to the Senior Secured Lenders agreeing to provide the Debtors

with a debtor in possession financing facility (the "DIP Facility") with access to up to $40 million of new money, which the Debtors anticipate will provide sufficient liquidity to fund these chapter 11 cases and execute their proposed in-court marketing and auction process. As discussed further below, among other process-oriented milestones, the DIP lenders required the Debtors to file this Motion no later than October 18, 2017.

9.    The liquidity provided by the DIP, however, is necessarily finite, and therefore, maximizing value for the benefit of the Debtors' estates will depend in large part on the Debtors' ability to swiftly proceed toward completion of their marketing and auction process as proposed herein. To that end, the Debtors embarked on a renewed postpetition marketing process immediately following commencement of these chapter 11 cases. With Lazard's assistance, the Debtors prepared a revised list of potential buyers. Lazard solicited input from the financial advisor to the Senior Secured Lenders, who suggested certain additional potential buyers, who were also added to the list. The list includes both financial and strategic buyers and consists of four groups: (i) those who were active in the prepetition marketing process and submitted some indication of value, (ii) those who signed a confidentiality agreement in connection with the prepetition marketing process, but did not ultimately submit a bid, (iii) those the Debtors approached in the prepetition marketing process, but did not respond or sign a confidentiality agreement, and (iv) potential bidders who reached out to the Company or its advisors or were added at the request of Lazard or the Senior Secured Lenders' financial advisors. Lazard has reached out to each potential buyer to solicit interest to participate in the marketing process, and following the filing of the Motion, will provide each potential buyer who has expressed an interest in participating in the sale process with a copy of the proposed Bid Procedures.

10.     Accordingly, the Bid Procedures establish an efficient timeline, which also dovetails with certain milestones under the DIP Facility, and is designed to determine the highest or otherwise best offer under the circumstances for the Debtors' Assets and preserve the Debtors' business as a going concern. The proposed Bid Procedures contemplate that a buyer for the Debtors' assets will be identified at a later date, either at auction or, under appropriate circumstances, through the Debtors' identification of a Stalking Horse Bidder. In addition, the Debtors are continuing discussions in parallel with their Senior Secured Lenders regarding a potential restructuring transaction. Although not yet finalized at this juncture, the negotiations have proven fruitful, and the Debtors anticipate reaching definitive documentation in the near term. This transaction will likely be either: (a) the Senior Secured Lenders agreeing to serve as the Stalking Horse Bidder in the sale process or (b) the Senior Secured Lenders agreeing to backstop the Debtors' sale process through a debt-for-equity exchange pursuant to a chapter 11 plan of reorganization.

11.     In light of the foregoing, and as set forth in further detail below, the Bid Procedures and the related relief requested in this Motion will provide a well-defined structure to the Debtors' already ongoing postpetition marketing process and will facilitate an open and fair public sale designed to maximize value for the estate. Accordingly, the Debtors believe that the Bid Procedures and the relief requested by this Motion are in the best interests of the Debtors' estates and their stakeholders, and the Debtors therefore respectfully request that the Court grant this Motion.

### Milestones Under the DIP Facility

12.    Under the DIP Facility, the Debtors were required to file this Motion no later than 15 days following the Petition Date[4] seeking, among other things, the approval of the Bid Procedures as well as the Senior Secured Lenders' ability to "credit bid" for or otherwise purchase the Debtors' Assets, which motion was to be in a form and substance satisfactory to the Administrative Agent and Required Lenders (each as defined in the credit agreement underlying the DIP Facility, the "DIP Credit Agreement"). In addition, the Debtors are required to:

- **_Bid Solicitation:_** On or before the Petition Date, begin to solicit bids from potential bidders for the sale of the Debtors' Assets, including resoliciting bids from potential buyers contacted by the Debtors prior to the Petition Date.

- **_Bid Procedures Order:_** On or before thirty-five days after the Petition Date, obtain an order approving, among other things, the Bid Procedures in connection with marketing the Debtors' Assets.

- **_Sale Approval:_** On or before seventy-one days after the Petition Date, obtain an order approving the sale of the Debtors' Assets.

- **_Sale Consummation:_** On or before seventy-eight days after the Petition Date, consummate the sale of the Debtors' Assets.

Failure to meet any of these milestones will trigger an event of default under the DIP Facility.

### The Bid Procedures.

13.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner under the circumstances, the Debtors developed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order. The following describes the salient points of the Bid Procedures and discloses certain information required pursuant to Local Rule 6004-1:[5]

---

[4]    Although this milestone originally provided that the Motion be filed no later than 10 days after the Petition Date, the Required Lenders (as defined below) agreed to extend it to 15 days after the Petition Date.

[5]    This summary is qualified in its entirety by the Bid Procedures attached as **Exhibit 1** to the Bid Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid

(a)  **Non-Binding Indications of Interest.**  Any party interested in making a proposal, solicitation, or offer (regardless of whether such party has been determined to be an Acceptable Bidder) must submit a non-binding indication of interest (an "Indication of Interest") on or before November 10, 2017, at 5:00 p.m. (prevailing Eastern Time) (as may be extended without notice or hearing by the Debtors, in consultation with the Consultation Parties (as defined in the Bid Procedures),[6] the "Indication of Interest Deadline"). The Indication of Interest should (a) identify the Assets such party is interested in acquiring, (b) set forth a proposed purchase price for the proposed transaction, including by identifying separately any cash and non-cash components of the proposed transaction consideration, including, for example, certain liabilities to be assumed, and (c) identify any proposed conditions to closing the transaction. The Debtors shall deliver any Indication of Interest received to the Consultation Parties within two business days of receipt.

For the avoidance of doubt, the submission of an Indication of Interest by the Indication of Interest Deadline is not a prerequisite for Potential Bidders to submit a Qualified Bid.

(b)  **Bid Requirements (Local Bankr. R. 6004-1(c)(i)(A), (B)).**  Any bid by an Acceptable Bidder must be submitted in writing and determined by the Debtors, in their reasonable business judgment, and in consultation with the Consultation Parties, to have satisfied the following requirements:

(i)  *Purchase Agreement.*  Each Bid must be in writing and must include:  (a) a purchase agreement signed by the Acceptable Bidder (a "Purchase Agreement"); and (b) a marked version, or blackline, of the form asset purchase agreement that the Debtors will make available in the electronic data room, reflecting the Acceptable Bidder's proposed changes.

(ii)  *Assets.*  Each Bid must be a bulk bid to purchase all or substantially all of the Assets, and must clearly state which liabilities of the Debtors the Acceptable Bidder is agreeing to assume.

---

Procedures, the terms of the Bid Procedures shall govern.

[6]  As defined, "Consultation Parties" means  (i) the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee"), (ii) representatives of the Committee, including but not limited to the Committee's professionals, and (iii) the Senior Secured Lenders, the holders of DIP Claims, and their respective agents and professionals, except that if any of such parties submit a Bid, then the Debtors, prior to the Auction, are permitted but not required to disclose to any such party the terms of any Bid submitted by another party.

(iii) **Total Consideration.** Each Bid must clearly set forth the purchase price to be paid, including and identifying separately any cash and non-cash components. The Bid must confirm that such consideration is not subject to any contingencies.

(iv) **Deposit.** Each Bid must be accompanied by a cash deposit in the amount equal to 10 percent of the proposed purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit"); *provided*, that no Deposit shall be required with respect to any Bid that is a credit bid (in whole or in part) by the agent for the Senior Secured Lenders and/or the agent for the holders of DIP Claims.

(v) **Minimum Bid.** Except to the extent that a Bid includes a credit bid of all DIP Claims (as defined herein), the aggregate consideration (which may include non-cash consideration) must equal or exceed the sum of:

    (A) sufficient cash to pay all allowed claims (the "DIP Claims") arising under the Debtors' DIP Facility in full in cash on the effective date (the "Effective Date") of a plan of reorganization; *plus*

    (B) an amount of cash sufficient to fund an amount determined by the Debtors, in consultation with the Consultation Parties, that is sufficient to pay all administrative and priority claims through the Effective Date; *plus*

    (C) $1,000,000.

(c) **Non-Contingent Bid.** Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include a schedule of executory contracts and unexpired leases to be assumed to the extent applicable to the Bid, a clearly marked version of the form asset purchase agreement that the Debtors will make available in the electronic data room showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

(d) **Bid Deadline.** Each Bid must be transmitted via email to the Debtors, counsel to the Debtors, and the Debtors' investment banker (in .pdf or similar format) so as to be *actually received* on or before **December 5, 2017 at 5:00 p.m. (prevailing Eastern Time).**

(e) **Qualified Bids.** A Bid that satisfies the Bid Requirements, as determined in the Debtors' business judgement, in consultation with the Consultation

Parties, shall constitute a Qualified Bid and such Acceptable Bidder shall be a Qualified Bidder. Only Qualified Bidders shall be entitled to bid at the Auction. For the avoidance of doubt, any Bid that is a credit bid (in whole or in part) by the agent for the Senior Secured Lenders and/or the agent for the holders of the DIP Claims is a Qualified Bid, and each of the Senior Secured Lenders, the holders of DIP Claims, and their respective agents (all in their capacities as such) are a Qualified Bidder. No party that, in the reasonable judgment of the Debtors and after consultation with the Consultation Parties, either is not negotiating or acting in good faith or acting in accordance with its contractual obligations in its dealings with any Debtor or any of its subsidiaries may be a Qualified Bidder.

(f)     **Right to Credit Bid.** Any Qualified Bidder who is a Secured Creditor shall have the right to credit bid all or a portion of the value of such Secured Creditor's secured claims within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured (the "Credit Bid Right"). For the avoidance of doubt, every dollar of a credit bid shall be treated the same as a dollar from a cash bid and a cash bid shall not have been deemed higher or otherwise better solely for the reason that it is a cash bid and not a credit bid. In exercising their Credit Bid Right, the Senior Secured Lenders may credit bid any portion and up to the entire amount of their outstanding secured claims, including on account of their secured claims under the DIP Facility, pursuant to section 363(k) of the Bankruptcy Code.

(g)     **Bidding Increments (Local Bankr. R. 6004-1(c)(i)(C)).** Any Overbid following the Baseline Bid or following any subsequent Prevailing Highest Bid (as defined below) shall be in increments of value equal to (or exceeding) $500,000 as determined by the Debtors in an exercise of their business judgement, in consultation with the Consultation Parties.

(h)     **Breakup Fee and Expense Reimbursement.** Upon entry of the Bid Procedures Order, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment and in consultation with the Consultation Parties, to (a) select no more than one Acceptable Bidder to act as a stalking horse bidder (a "Stalking Horse Bidder") in connection with the Auction and (b) in connection with any stalking horse agreement with a third-party bidder, provide for a breakup fee (a "Breakup Fee") (excluding the Senior Secured Lenders, the holders of DIP Claims, and creditors of the Debtors and/or their affiliates holding claims against one or more of such entities greater than $5,000,000) and the reimbursement of the reasonable and documented out-of-pocket fees and expenses of such Stalking Horse Bidder (an "Expense Reimbursement") in a collective amount not to exceed three (3) percent of the Bid Value of the Stalking Horse Bidder's bid. Pursuant to the Bid Procedures Order, the Debtors shall be authorized to indefeasibly pay any such amounts to the Stalking

10

Horse Bidder pursuant to section 363(b)(1) of the Bankruptcy Code and any such amounts paid by the Debtors to the Stalking Horse Bidder will not be subject to disgorgement irrespective of whether the Stalking Horse Bidder is ultimately the Successful Bidder.

(i) **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(E)).** Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors. Notwithstanding anything else in the Bid Procedures, a Qualified Bid submitted by the respective agents on behalf of the Senior Secured Lenders and/or the holders of DIP Claims shall not be required to serve as a Backup Bidder unless such lenders consent to being a Backup Bidder.

(j) **Highest or Otherwise Best Bid.** When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate: (i) the type and amount of Assets sought and Assumed Obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; and (v) the tax consequences of such Qualified Bid.

(k) **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).** The Debtors reserve their rights to modify the Bid Procedures in their reasonable business judgment, in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) to the extent not inconsistent with Bid Procedures, adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) to the extent not inconsistent with the Bid Procedures, rejecting any or all Bids or Qualified Bids.

14.     Importantly, the Bid Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid

proposals, and, as noted, preserve the Debtors' right to modify the Bid Procedures and pursue a chapter 11 reorganization as necessary or appropriate to maximize value for the Debtors' estates.

### Sale Hearing

15.    The Debtors request that the Court schedule the Sale Hearing on December 13, 2017, or as soon thereafter as the Debtors may be heard, in order to allow the closing of the sale by no later than December 20, 2017.   The Debtors also request that objections, if any, to the Sale Motion be filed no later than 12:00 p.m. noon (prevailing Eastern time) on December 6, 2017.

16.    At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the sale of the Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (except as may otherwise be provided in the Sale Motion) with all such liens, claims and interests to attach to the proceeds of the sale, with the same validity and in the same order of priority as they attached to the Assets prior to the sale, including the assumption by the Debtors and assignment to the Successful Bidder of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.

### Notice of Auction and Sale Hearing

17.    The Auction, if any, shall take place at 9:00 a.m. (prevailing Eastern Time) on December 11, 2017, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date and time as selected by the Debtors.

18.    As noted above, the Debtors request that the Court schedule the Sale Hearing on December 13, 2017, or as soon thereafter as the Debtors may be heard.  The Debtors propose that objections, if any, to the Sale Motion be filed on or before 12:00 p.m. noon (prevailing Eastern time) on December 6, 2017.

19.    The Debtors further request that the Court approve the manner of notice of the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached as

**Exhibit 2** to the Bid Procedures Order (the "Auction and Sale Hearing Notice"), which the Debtors will serve within three business days after entry of the Bid Procedures Order on all known creditors of the Debtors.

20.     The Auction and Sale Hearing Notice will provide that any party that has not received a copy of the Bid Procedures Motion or the Bid Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, Esquire).

21.     In addition, the Debtors will publish an abbreviated version of the Auction and Sale Hearing Notice in *The New York Times (National Edition), The DailyDAC*, and *The Detroit News* at least ten days prior to the Auction. The Debtors will also post the Auction and Sale Hearing Notice and Bid Procedures Order on the website of the Debtors' claims and noticing agent, at http://dm.epiq11.com/#/case/GAL/info. The Debtors submit that no other or further notice should be required.

**Basis for Relief**

I.     **The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

22.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that

have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

23.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.     *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

24.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.     *See, e.g.*, *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

25.     The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets.     The proposed Bid Procedures will allow the Debtors to conduct the sale and marketing process in a controlled, fair, and open fashion and are designed to encourage

participation by financially capable bidders who can demonstrate the ability to close a transaction. Specifically, the Bid Procedures contemplate an open marketing process with minimum barriers to entry and provide potentially interested parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

26.    At the same time, the Bid Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the sale. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

27.    The Debtors submit that the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District. *See In re Marsh Supermarkets Holding*, Case No. 17-11066 (BLS) (Bankr. D. Del. May 30, 3017); *In re United Road Towing, Inc.*, Case No. 17-10249 (LSS) (Bankr. D. Del. Mar. 6, 2017); *In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. Aug. 31, 2016); *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 19, 2015) *In re Quicksilver Res., Inc.*, Case No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015).[7]

## II.    Approval of the Breakup Fee and Expense Reimbursement are Appropriate.

28.    The Debtors also seek authority, but not direction, pursuant to the Bid Procedures to provide for a Breakup Fee and Expense Reimbursement to a Stalking Horse Bidder only in the event that the Debtors elect to enter into a stalking horse arrangement with a third-party bidder. The amount of the Breakup Fee and the Expense Reimbursement, collectively, will not exceed

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

three percent of the Bid Value of the Stalking Horse Bidder's bid.  As discussed above, the Senior Secured Lenders, the holders of DIP Claims, and creditors of the Debtors and/or their affiliates holding claims against one or more of such entities greater than $5,000,000) are not eligible or entitled to the Breakup Fee even if selected the Stalking Horse Bidder.

29.    In conjunction with the Bid Procedures, the Breakup Fee and Expense Reimbursement are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Stalking Horse Bidder, if any, will be the stalking horse for competitive bids, perhaps leading to further competition, and would establish a baseline against which higher or otherwise better offers can be measured.

30.    As indicated above, the Debtors hereby request that the Court grant the Debtors discretion to agree to the Breakup Fee and Expense Reimbursement, within specified parameters, in favor of a Stalking Horse Bidder in the event that one is selected by the Debtors.  The Debtors submit that cause exists to approve such payments and procedures because they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest or best price for the Assets.

31.    The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  *In re Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F. 3d 527 (3rd Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates.  *See id.* at 533.

32.    The *O'Brien* court identified at least two instances in which bidding incentives such as expense reimbursements and breakup fees may provide benefit to the estate.  First,

benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

33.    Under this standard, the Debtors' requested authority to approve the Breakup Fee and Expense Reimbursement in these cases passes muster. The Debtors recognize the significant expenditure of time, energy, and resources that would go into preparing a stalking horse bid, and that bidding incentives may encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Assets, despite the inherent risks and uncertainties of the chapter 11 process. Moreover, a stalking horse would provide a floor bid with respect to the Assets that it offers to purchase, and may encourage potential bidders to put their best offer forward and engage with the Debtors well before the Bid Deadline in an effort to be chosen as a stalking horse bidder. Any such increased competition would inure directly to the benefit of the Debtors' estates.

34.    Further, the Breakup Fee and Expense Reimbursement, which at maximum would total no more than 3.0% of the Bid Value (as defined in the Bid Procedures) of the Stalking Horse Bidder's Bid, is fair and reasonable in amount, and is reasonably intended to compensate for the risk that a Stalking Horse Bidder, should one be selected by the Debtors, is taking by setting a baseline price and investing resources in making a bid. In fact, the 3.0% amount is well within the spectrum of expense reimbursements and termination fees approved by bankruptcy courts in this district in other chapter 11 cases. *See, e.g., In re Allied Nevada Gold Corp.*, Case

No. 15-10503 (MFW) (Bankr. D. Del. Apr. 24, 2015) (combined breakup fee and expense reimbursement of 2.5% of purchase price); *In re A123 Sys., Inc.*, Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012) (breakup fee of approximately 3% of sale price); *In re Lang Holdings, Inc.*, Case No. 09-12543 (KJC) (Bankr. D. Del. Oct 1, 2009) (approving a combined break-up fee and expense reimbursement of 5% of the purchase price); *In re Global Motorsport Grp., Inc.*, Case No. 08 10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (breakup fee of approximately 4% of sale price); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 12, 2007) (approximately 2% breakup fee awarded on $47.25 million stalking horse bid).

35.     For the reasons set forth above, the Debtors respectfully request approval of the Breakup Fee and Expense Reimbursement to be authorized in favor of a Stalking Horse Bidder that may be chosen by the Debtors in their discretion.

### III.   The Form and Manner of the Auction and Sale Hearing Notice Should Be Approved.

36.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Auction. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the deadline for filing any objections to the relief requested herein.

37.     As noted above, within three business days of entry of the Bidding Procedures Order, the Debtors will serve the Auction and Sale Hearing Notice on all known creditors of the Debtors. In addition, the Debtors will publish an abbreviated version of the Auction and Sale Hearing Notice in the *The New York Times (National Edition), The DailyDAC,* and *The Detroit News* at least ten days prior to the Auction. And the Debtors will also post the Auction and Sale Hearing Notice and Bid Procedures Order on the website of the Debtors' claims and noticing

agent, at http://dm.epiq11.com/#/case/GAL/info.  The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Auction and Sale Hearing Notice as provided for herein, constitutes good and adequate notice of the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of notice.

## IV.   Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

38.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

39.    In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  *See In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014) (order approving bid procedures which authorized parties with secured claims to credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the

19

administrative agent to credit bid); *In re Hayes Lemmerz Intl, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing any interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, No. 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citation omitted).

40.    Accordingly, the Senior Secured Lenders should be entitled to credit bid some or all of the claims secured by its collateral, including on account of its claims under the DIP Facility, pursuant to section 363(k) of the Bankruptcy Code.

## Notice

41.    The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Committee; (c) counsel to the agent under the Debtors' first lien credit facility and the Debtors' debtor-in-possession credit facility; (d) counsel to the agent under the Debtors' mezzanine credit facility; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the office of the attorneys general for the states in which the Debtors operate; (h) all known holders of liens, encumbrances, and other claims secured by the Assets; (i) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>No Prior Request</u>**

42.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Bid Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Wilmington, Delaware
Dated:  October 18, 2017

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:          ljones@pszjlaw.com
                    tcairns@pszjlaw.com
                    jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          james.sprayregen@kirkland.com
                    ryan.bennett@kirkland.com
                    alexandra.schwarzman@kirkland.com
                    benjamin.rhode@kirkland.com

*Proposed Counsel to the Debtors*